**Shell Oil Company v. E. J. Jolley, Doris Jolley, Blanche L. Terjelian, Automaster Motor Company, Inc., The Merchants National Bank, The Howard National Bank, and The Howard National Bank and Trust Company**

[296 A.2d 236]

No. 187-71

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed October 3, 1972

*John L. Primmer, Esq.,* of *Yandell, Page & Archer,* Burlington, for Plaintiff.

*Kissane & Heald,* St. Albans, for E. J. Jolley and Doris Jolley.

*Wool, Agel, Murdoch & Kittell,* Burlington, for Blanche L. Terjelian.

**Smith, J.** Due notices of appeal have been taken from the order of the chancellor below by the plaintiff, Shell Oil Company, as well as by defendants E. J. Jolley and Doris Jolley, and briefs have been filed before this Court by the above parties. Blanche J. Terjelian has filed her brief in support of the argument of the Jolleys, seeking to uphold the order of the chancellor denying plaintiff Shell's application for specific performance of a certain option provision. The named defendants in the case, other than the Jolleys and Terjelian, entered no appearances nor did they participate in the proceedings in the court of chancery below.

The plaintiff is hereinafter referred to as "Shell", and the defendant Jolleys as "Jolley". In its bill of complaint, Shell sought to enjoin Jolley from interfering with its lease of the gas service station, located in South Burlington, Vermont, and which is the property in dispute in this litigation, and further sought specific performance of an alleged right to purchase this property, as provided in a certain lease and agreement originally entered into between Shell and Rene R. Barsalou and Rita R. Barsalou, and dated August 13, 1958. Defendant Jolley filed a counterclaim for ejectment against Shell. In its order, the court of chancery denied the specific performance sought by Shell on its alleged option, and also denied the counterclaim of the defendant Jolley for ejectment. Shell, in its brief before this Court, claims error on the part of the chancellor in denying its right to specific performance under its alleged option, but seeks to sustain the ruling of the chancellor denying the ejectment sought by Jolley in the counterclaim. Jolley and Terjelian here seek to sustain the order of the chancellor denying the right of specific performance to

Shell, and Jolley also has briefed claimed error on the part of the chancellor in denying its claim for ejectment.

In order to properly understand the questions presented here it is necessary for us to set forth the rather complicated factual picture that brought about the action in the chancery court below, and upon appeal, here.

Shell entered into a lease with the Barsalous on August 13, 1958, for certain premises owned by the Barsalous located at the southeast corner of Shelburne Road and Allen Road in South Burlington. On the same date, Shell sublet the premises described back to the Barsalous. The monthly rental in each lease was. $183.00, so that no payments were actually made.

The base lease was supplemented by "Agreement Supplementing Lease" executed between the Barsalous and Shell, and which purported to amend the base lease as follows:

"(1) that the term of the lease began on the 21st day of July, 1959, and shall end on the 31st day of July 1974, (subject, however, to any rights of termination or extension provided in the lease); (2) that rent commenced to accrue under the lease on the 21st day of July 1959 (3) that the lease, as hereby supplemented, is hereby ratified, confirmed and continued in all respects; and (4) that this Agreement shall be binding on and inure to the benefit of the heirs, administrators, executors, successors and assigns of Lessor, and the successors and assigns of Shell."

Of great importance in the determination of the cause before us are two options inuring to the benefit of Shell in Paragraph 9 and Paragraph 10 of the lease and its supplemental agreement. Paragraph 9 provided that Shell could have the option to purchase the leased property for the sum of $30,000 during the term of the lease or any extension thereof, subject to the provisions that Shell could not exercise this option unless and until the Barsalous voluntarily or involuntarily cancelled the sublease of the same date wherein Shell leased the premises back to the Barsalous. Paragraph 10 of the same lease provided that Shell has the first right of refusal should the Barsalous receive an acceptable *bona fide* offer to purchase.

On June 27, 1963, the Barsalous conveyed the leased land, as part of a larger parcel, to Blanche L. Terjelian by warranty deed, which was duly recorded. The purchase price paid by Terjelian was $45,000.00. Due notice was given to Shell by Barsalou under the lease and agreement between the parties, but Shell elected not to exercise its option to purchase, at the price offered to Barsalou by Terjelian.

On the same day as the sale from Barsalou to Terjelian, Shell entered into a new sublease agreement with Blanche Terjelian which replaced the previous sublease from Shell to Barsalou, with the monthly rental again being $183.00. Blanche Terjelian then leased the entire premises conveyed to her to T. P. Motors, Inc., for a period of ten years, commencing October 8, 1963, and terminating October 8, 1973, with an option to renew for a five-year period. The monthly rental payable by T. P. Motors, Inc., to Blanche Terjelian was $400.00. Just as in the case of the lease between Shell and Barsalou, the rent between Shell and Terjelian offset each other, and no rental payments were made by either party to the other.

The $400.00 monthly rental payable to Blanche Terjelian by T. P. Motors, Inc., was used to pay a mortgage held by Shell on the property owned by Blanche Terjelian at the rate of $182.16 a month. The balance of the monthly rental received from T. P. Motors, Inc., was used to pay a mortgage held by the Barsalous.

The lease from Blanche Terjelian to T. P. Motors, Inc., was duly recorded and provided that the lease was:

> "subject to certain lease agreements and amendments now existing between the Barsalous and Shell Oil Company, all of which are duly recorded in the Town Clerk's office in South Burlington and which the Grantee herein assumes and agrees to pay."

Robert Terjelian, the major stockholder of T. P. Motors, Inc., handled all the negotiations with Shell for his wife, Blanche, and apparently was the real party in interest in all of the transactions involving Shell and his wife, and Shell was well aware of this. The sublease from Shell to Terjelian was cancelled by Shell and no payments were made thereafter by Shell to Blanche Terjelian, pursuant to the base lease.

It appears that T. P. Motors, Inc., was behind on ·its $400.00 monthly rental, and the mortgage note to Shell was in default. A foreclosure action was brought by Shell against Terjelian.

In August of 1970, Robert Terjelian, duly authorized agent for his wife, together with his attorney, met with a Regional Representative of Shell· Oil Company and the attorney for the company. At this meeting, Terjelian notified Shell of the proposed sale of the property to E. J. Jolley and Doris Jolley for $95,000.00, and offered to sell the property to Shell for the same price. Shell refused, and still refuses to pay .$95,000.00 for the property.

On October 12, 1970, Shell cancelled its sublease with Blanche Terjelian, and notified her that Shell would be willing to pay $30,000.00 for that portion of the property under lease. This offer was refused by Blanche Terjelian, and on December 24, 1970, Blanche Terjelian conveyed her property to the defendant Jolley by warranty deed for $95,000.00. Shell's mortgage was then paid in full and the foreclosure action discontinued.

What we are faced with here is the effect of the dual options to purchase held by Shell on the property, now in the name of Jolley. Shell argues that this Court should hold that the option granting the first refusal right is secondary to the fixed-price option. It admits that there are decisions in other jurisdictions that, in effect, hold a fixed-price option is terminated upon receipt by the lessee of notice of the opportunity to exercise a right of first refusal higher than the option price. *Shell Oil Co.* v. *Blumberg,* 154 F.2d 251 (5th Cir. 1946); *Harding* v. *Gibbs,* 125 Ill. 85, 17 N.E. 60 (1888). But Shell contends that under the later case of *Shell Oil Company* v. *Prescott,* 398 F.2d 592 (6th Cir. 1968), the lessee was entitled to exercise its fixed-price option even after it had received notice of a price offered by a *bona fide* purchaser in excess of the option price.

Turning to the *Prescott* case, we find that the lease provisions which the Federal court interpreted in that case were markedly similar in some respects to those in the case now here. But there is also a marked difference in the factual situation presented. In *Prescott,* Shell received notice from

Prescott that she had received a *bona fide* offer from a third party to purchase the property in suit for $50,000, and gave Shell the right to purchase the property at that price under the first refusal opinion found in the terms of the lease.

Shell notified Prescott that it declined to exercise its first refusal option, but that it did elect to exercise its fixed-price option to acquire the property for $32,500. In other words, in *Prescott,* Shell, upon first receipt of notice from Prescott that a *bona fide* offer for the property involved had been made in an amount greater than the fixed-option price, proceeded at once to exercise its right under the fixed-option clause to purchase the property. We would agree with the decision of the Federal court under the circumstances presented.

But such are not the circumstances here. In the instant case, Shell was presented, as in *Prescott,* with due notice that a *bona fide* offer for $45,000.00 had been presented to Barsalou, the owner and sublessor of the property upon which it had its dual option. At that time, Shell had the opportunity to exercise either of its two options by Terjelian. It could have exercised its right of first refusal and bought the property for $45,000, or more advantageously, it could, as held in *Prescott,* have exercised its option to buy the property for $30,000.00, the fixed price. But Shell did not exercise either of its two options, but allowed Barsalou to sell the property to Terjelian, and then proceeded to replace the sublease from Shell to Barsalou by entering into a new sublease agreement with Blanche Terjelian, under the same terms of payment as in the previous sublease to Barsalou.

The sale from Barsalou to Terjelian was in June, 1963, and it was at this same time that Shell entered into its new sublease agreement with Terjelian, thus recognizing the validity of the sale and transfer of title of the property from Barsalou. In fact, Shell took a mortgage on the property from Terjelian, which mortgage later became in default as a result of non-payment of rent from T. P. Motors, Inc., to Terjelian, part of which payments were to be made to Shell on the mortgage, and which agreement was not carried out by T. P. Motors, Inc. Parenthetically, foreclosure proceedings were

brought by Shell, but such mortgage was paid at the time of the sale of the property from Terjelian to Jolley.

In August of 1970, more than seven years after the sale from Barsalou to Terjelian, Blanche Terjelian received an offer of $95,000.00 from Jolley for the property. There is no doubt that Terjelian did not comply with all the technical requirements set forth in Paragraph 10 of the lease in notifying Shell of the offer from Jolley, and Shell briefs that point here. But Terjelian's representative, and her attorney, met with the Field Regional Representative of Shell, and its attorney, and Shell was informed of the terms of the offer from Jolley, and presented with the opportunity of purchasing the property under its first refusal option. Shell refused, claiming that the property did not have this value. We agree with the trial court that regardless of the fact that Terjelian did not comply with all the formalities of Paragraph 10 of the lease from Shell to Barsalou, which required notice of the proposed sale in writing, that she did substantially comply with the requirements of notice, and that the refusal of Shell to exercise its first refusal option at the price of $95,000.00 would have made a full technical performance under the lease a useless act. In fact, the lower court concluded, without exception being briefed, that Shell demonstrated by its conduct that it would not purchase the property at that price if again given the opportunity. No error is found.

After notification of the offer of Jolley by Terjelian to Shell, the oil company cancelled its sublease with Terjelian on October 12, 1970. It then notified Terjelian that it would pay $30,000.00 for the property under its fixed-price option. Terjelian refused this offer and on December 24, 1970, conveyed the property to Jolley for $95,000.00.

Shell argues that because of the wording of Paragraph 10 the parties intended that Shell would retain its fixed-price option regardless of opportunities to exercise the first refusal right. We think this reasoning is correct as it applied to Shell and Barsalou, and as we have already indicated, when Shell received due notice from Barsalou that a *bona fide* offer of $45,000 had been received from Terjelian for the property, Shell could have exercised either its fixed-price option or its option for first refusal. But it did not exercise either of its

dual options and was fully conversant with the fact that the property had been sold by Barsalou to Terjelian for $45,000 and recognized Terjelian as the new owner of the property and entered into a new sublease agreement with Terjelian. There can be little doubt that all parties at that time, Shell, Barsalou and Terjelian, were well aware that Shell deliberately did not exercise its right to buy the property at a fixed-option price, although all were aware the price paid by Terjelian for the property was well in excess of the fixed-option price. Now, however, when the value of the property has increased to $95,000, which fact is proved by Jolley having paid this amount to Terjelian, Shell belatedly seeks to exercise its purchase price option of $30,000.

The dual options, of course, are part of a contract, and we must apply the rules for the interpretation of contracts, the prime object being to ascertain the intention of the parties. It must be kept in mind, also, that Shell, at this point, is seeking specific performance of only one of its dual options, that being the one for purchase of the property at a fixed price.

Option provisions, like other provisions in contracts, are to receive such an interpretation as to avoid absurdities. *Butler* v. *Richardson*, 74 R.I. 344, 60 A.2d 718 (1948).

As has been previously noted in this opinion, Shell had been given full opportunity to exercise its first refusal option at the time it received due notice of the sale of the property by Barsalou to Terjelian. At that time, it could also have exercised its option to buy the property at a fixed-option price, but it exercised neither option.

In *Shell Oil Company* v. *Blumberg, supra,* involving dual options, the view was taken that the parties intended that the exercise of one of the options, or the taking of steps to put it in operation, as by giving notice of an offer to the optionee and thereby putting him upon election, should terminate the effective life of the other option. Such was the situation presented by the notification to Shell by Barsalou of the *bona fide* offer from Terjelian for the purchase of the property, which offer was proved to be *bona fide* by the subsequent sale of the property for the price offered.

Shell has argued here that the right of first refusal is to provide the lessor with a means of disposing of the property

in case its value does not appreciate to the level of the option price, and this by no means contradicts the parties' intent in agreeing to a fixed-price option. Shell claims that by agreeing to the dual option the parties have entered into a gamble, with the first refusal option being to the benefit of the owner, in the event the property does not appreciate to the fixed-option price, while, on the other hand, if the property appreciates in value beyond the amount set in the fixed-price option, the benefit accrues to the lessee.

We do not take that view here, having in mind that this is an action brought in equity. The unchallenged evidence is that the property has appreciated greatly in value since the time of the original agreement between Shell and Barsalou. This is shown by the prices paid in each of the two subsequent sales of the property. There is also a complete lack of evidence that such was the intention of the original parties, or that there was ever a possibility that the property would decrease in value.

Shell lost its right to exercise its fixed-price option when it had full knowledge of the $45,000 offer to Barsalou from Terjelian, at which time it could have exercised either of its dual options. The action is in equity, and those who seek equity must be prepared to give equity. Shell could not, consistent with any principles of fair and honest dealing, allow Barsalou to sell to Terjelian, with its full knowledge of such transaction, and with its then refusal or failure to exercise either of its two options, and at a time when the property had appreciated in value to an amount more than three times the fixed-option price, insist upon specific performance of the fixed-price option provisions. Such a result would be unconscionable, and offensive to all equitable principles. We find no error in the chancellor's refusal to order specific performance of Shell Oil Company's option for the purchase of the leased property for $30,000, and that the conveyance from Terjelian was effective.

We now turn to the briefed exceptions of Jolley to the alleged error of the chancellor in denying Jolley's counterclaim against Shell Oil Company, based on ejectment. Shell has not paid any monthly rental to Jolley since the time

of purchase of the property in question by Jolley. Paragraph 15 of the lease provides:

> "If, at any time, Lessor's title or right to receive rent hereunder is disputed, or there is a change of ownership of Lessor's estate by act of the parties or operation of law, Shell may withhold rent thereafter accruing until Shell is furnished proof satisfactory to it as to the party entitled thereto."

There can be no doubt that the principal issue involved here is the ownership of the property deeded to Jolley. During the trial, Shell conceded that once the issue of title to the property was settled it would pay rent, including all back rent, to the rightful owner. Shell furnished a bond to cover damages arising out of its restraining order in the amount of $25,000. We think under the language quoted above, of Paragraph 15 of the lease, which is clear and unambiguous, Shell had the right to withhold rental payments until the matter of title was settled. The matter of title having been determined, Shell is entitled to occupy the property now owned by Jolley under the terms of its lease. Jolley is entitled to the payment of all withheld rental payments from Shell, as well as to all future rent payments which may be due to Jolley from Shell under the terms, and during the duration of the terms of the lease. No error is found in the chancellor's determination that ejectment did not lie.

*Judgment affirmed.*